## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **AARON LOVETT**, |
| Plaintiff, |
| v. |
| **UNITED STATES OF AMERICA**, *et al.*, |
| Defendants. |

Case No. 1:23-cv-02879 (TNM)

## MEMORANDUM ORDER

Aaron Lovett alleges that, as he was returning home one night, federal agents accosted him, tased him, and beat him. More, officers from the Metropolitan Police Department (MPD) looked on and either stood idly by or actively participated. Defendants have moved to dismiss the Complaint on a host of grounds. For the reasons below, several of Lovett's claims survive, but others cannot. He failed to state a claim for relief against the federal agents because this constitutes a new context under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and special factors counsel against extending that tenuous precedent here. And though most of Lovett's claims against the MPD agents are viable, he fails to state a claim for municipal liability against the District of Columbia under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

### I.

The facts below come from Lovett's First Amended Complaint (Compl.), ECF No. 20, and the Court accepts them "as true" for now. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Lovett is a D.C. resident who lives near the Cleveland Park neighborhood. Compl. ¶¶ 2, 14. In mid-December 2022, he was returning home in the wee hours of the morning when, after

parking his car, several uniformed police officers confronted him.  *Id.* ¶¶ 14–15, 17.  As he was getting out of his truck, several officers stopped him and claimed that he lacked license plates on his vehicle.  *Id.* ¶¶ 17–19.  Although he told the officers that he did, they "continued to detain" him as they "walked around the parked vehicle and then ran a check of the plate through" a government database.  *Id.* ¶¶ 20–21.  Things went downhill from there.

That database check returned an alert that the car was stolen.  Compl. ¶¶ 21.  That was correct—sort of.  *Id.* ¶ 22.  The car belonged to Lovett's girlfriend, who allowed him to use it.  *Id.*  He had reported the car stolen several weeks earlier but managed to recover it and failed to notify the police.  *Id.*  Although Lovett informed the officers of this, they were unconvinced.  *Id.* ¶¶ 22–23.  Instead, they called for backup, surrounded Lovett, and began shouting orders at him.  *Id.* ¶¶ 21, 23.

Lovett demanded to know why he was being detained, but the officers refused to answer.  Compl. ¶ 28.  Instead, they became physical.  They "push[ed]" him, and then "instructed him to turn around and put his hands over his head."  *Id.* ¶¶ 28–29.  Lovett complied; he turned around, faced the wall of his apartment building, and put his hands over his head as ordered.  *Id.* ¶ 30.  But the officers did not question him, search him, or handcuff him.  Instead, with his face to the wall and his back to them, one of the officers tased Lovett in the back.  *Id.* ¶¶ 30–31.

Lovett's body "started spasming" from the pain.  *Id.* ¶ 33.  He "cried out and fell over," and was "momentarily rendered speechless."  *Id.* ¶¶ 32–33.  Still, the officers did not relent.  Instead, as Lovett writhed in pain on the ground, an officer tased him again.  *Id.* ¶ 34.  Lovett screamed out in pain, "writhing around on the cement."  *Id.* ¶ 35.  Four of the officers "climbed onto his back and body" to subdue him.  *Id.*  They again refused to explain "why he was being detained."  *Id.* ¶ 36.  Finally, the officers arrested Lovett and called an ambulance.  *Id.* ¶¶ 38–39.

Lovett does not specify when the MPD officers arrived and began participating in this encounter.  But he does say, generally, that "he is aware that officers from both the United States Secret Service and the Metropolitan Police Department were present at various points."  *Id.* ¶ 16.

## II.

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  A complaint survives a Rule 12(b)(6) challenge if, and only if, it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (cleaned up).  This standard ensures that—assuming Lovett could back up everything he pleads in his Complaint—there would be some law under which the Defendants would be liable to him.  So the Court "treat[s] the complaint's factual allegations as true," *Sparrow v. United Airlines*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), and then asks whether those allegations give rise to "the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

## III.

Lovett sues two categories of Defendants.  First, the United States and a class of known and unknown Secret Service agents.  Compl. at 1–2.  Call these the Federal Defendants.  Second, he sues the District of Columbia and a set of unknown MPD officers.  *Id.*  Call these the District Defendants.  The Court first addresses Lovett's claims against the Federal Defendants and then those against the District Defendants.

## A.

The Federal Defendants have not moved to dismiss the claims against the United States, so those endure.  That means the only claims to address here are those against the Secret Service officers.  These claims, which purport to proceed under the inferred constitutional cause of action

identified in *Bivens*, 403 U.S. at 392, assert violations of Lovett's Fourth Amendment rights. Namely, unreasonable seizure, Compl. ¶¶ 111–20; excessive force, *id*. ¶¶ 121–35; failure to intervene, *id*. ¶¶ 136–47; and conspiracy to commit constitutional violations, *id*. ¶¶ 149–59.  But each of these claims falters for the same reason:  Lovett lacks a cause of action.

Lovett tries to sue the Secret Service officers directly under the Constitution.  But the Constitution "does not in so many words provide for its enforcement by an award of money damages." *Bivens*, 403 U.S. at 396.  Rather, the Constitution generally establishes primary rules regulating the conduct of state actors and leaves it to Congress to decide how and when to allow enforcement of those rules.  *See Egbert v. Boule*, 596 U.S. 482, 491 (2022).  Congress has not chosen to authorize suits against federal officials for all constitutional violations.  *Hernández v. Mesa*, 589 U.S. 93, 101 (2020).

Instead, for the first two hundred years of this nation's history, individuals seeking recourse for federal officers' violations of their constitutional rights would proceed through ordinary tort suits.  That is, the aggrieved citizen would sue the federal officer in tort, asserting a state cause of action—say, trespass to chattels or battery.  *See Buchanan v. Barr*, 71 F.4th 1003, 1014 (D.C. Cir. 2023) (Walker, J., concurring).  The federal officer would raise public authority as a defense, arguing, essentially, that the exercise of his official duties permitted him to trespass or to batter the plaintiff.  *Id*.  In reply, the plaintiff would then show that the officer's conduct violated the Constitution, and that a public authority defense was therefore unavailable to him. *Id*.; *see also Mesa*, 589 U.S. at 115–16 (Thomas, J., concurring).

*Bivens* represented a novel departure from this practice.  Under *Bivens*, plaintiffs no longer needed to identify any cause of action to bring a claim that a federal official violated their Fourth Amendment rights.  *Bivens*, 403 U.S. at 392.  Instead, *Bivens* itself supplied the cause of

action.  *Id*.  In quick succession, the Court extended its new inferred cause of action twice:  first to a Fifth Amendment Due Process claim, then to an Eighth Amendment Cruel and Unusual Punishment claim.  *See generally Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).

But the Supreme Court has now corrected course.  *Ziglar v. Abbasi*, 582 U.S. 120, 131–32 (2017).  Since 1980, the Court has refused on no fewer than 11 occasions to extend *Bivens* any further.  *Boule*, 596 U.S. at 486.  It has refrained, though, from overruling *Bivens* altogether. *Id*. at 491.  Instead, it has left it as a kind of "law trapped in amber."  *Cf. United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).  *Bivens* thus applies to the situations at issue in *Bivens*, *Davis*, and *Carlson*—and not much else.  *See Buchanan*, 71 F.4th at 1007.

Courts being asked to invoke *Bivens* follow a two-step approach.  First, they ask whether the claim involves "a new *Bivens* context."  *Boule*, 596 U.S. at 492.  That is, whether their case is "different in a meaningful way" from *Bivens*, *Davis*, or *Carlson*.  *Ziglar*, 582 U.S. at 139.  That may be if the defendants are of a different type than the DEA agents in *Bivens*.  *Id*. at 140.  Or because the right asserted is different.  *Id*.  Or because the action is framed at a different level of generality.  *Id*.  The list goes on.  *Id*.  The point is, if there is *any* meaningful deviation from the contours of the three recognized *Bivens* cases, a new *Bivens* context is involved.

With no new context, courts treat *Bivens* as the controlling precedent and allow the claim to proceed.  *Buchanan*, 71 F.4th at 1007; *see also Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).  But if the case *does* present a new *Bivens* context, courts then ask whether there are any "special factors" that indicate "that the Judiciary is . . . less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed."  *Boule*,

596 U.S. at 492 (cleaned up).  "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy."  *Id.* (cleaned up).

Now to apply those principles to this case.  The Federal Defendants argue that this is a new *Bivens* context, and that the Court may not recognize a *Bivens* remedy here.  They are right.

First, this case arises in a new *Bivens* context.  To start, at least two of the claims against the Federal Defendants involve a novel "constitutional right at issue."  *Ziglar*, 582 U.S. at 140.  *Bivens* itself involved claims for unreasonable seizure and excessive force.  *Bivens*, 403 U.S. at 389.  But Lovett's failure to intervene and conspiracy to commit constitutional violations claims are foreign to *Bivens*.  That separates this case from previously trodden soil.

It is not enough that the claims also stem from the Fourth Amendment.  *See Mesa*, 589 U.S. at 103 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").  What matters is whether, in recognizing the claim, the Court would be breaking new ground and stepping on Congress's toes in the process.  Crafting relief for entirely new theories of liability is a classic example of dabbling in "a legislative endeavor."  *Boule*, 596 U.S. at 491.  In short, these two claims place a novel "constitutional right at issue" and thus present an unfamiliar *Bivens* context.  *Ziglar*, 582 U.S. at 140; *see also Buchanan*, 71 F.4th at 1008 (declining to recognize *Bivens* action for Fourth Amendment claim).

That leaves Lovett's unreasonable seizure and excessive force claims.  *Bivens* did involve two such claims.  *Bivens*, 403 U.S. at 389.  But the claims here are still meaningfully different.  *Bivens* involved a breach of the plaintiff's home.  Law enforcement allegedly entered his house without a warrant and arrested him there, "manacling [him] in front of his family" and "strip-searching him" to boot.  *Byrd v. Lamb*, 990 F.3d 879, 882 (5th Cir. 2021) (citing *Bivens*, 403

U.S. at 389–90).  But Lovett alleges no such thing.  He was outside his apartment when the officers confronted him, in a parking lot.  Compl. ¶¶ 15–17.

That distinction is important because the Fourth Amendment specially privileges the home.  It identifies few things it protects by name, but the home is one of them.  *See* U.S. Const. Amend. IV.  No comparable protection exists elsewhere.  *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("At the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." (cleaned up)).  So Lovett is in a different place than Bivens was—literally and metaphorically.[1]  *See Ziglar*, 582 U.S. at 140 (describing *Bivens* as a claim against agents for "handcuffing a man in his own home without a warrant.").

The difference matters not only because the home is the Fourth Amendment's lodestar.  It is significant because distinct contexts call for discrete sets of legal rules and principles.  *See Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019).  In other words, the factual differences between this case and *Bivens* are not merely superficial:  they punt Lovett into a new judicial framework.

Take first his claim of unreasonable seizure.  Lovett insists he was unlawfully seized when he was stopped, detained, tased, tackled, and jailed "without explanation."  Compl. ¶¶ 19–45.  Say the Court considered this allegation.  It would start by asking whether there was reasonable suspicion for the initial traffic stop and detention under *Terry v. Ohio*, 392 U.S. 1

---

[1] The parking deck outside Lovett's building does not count as a "curtilage" that the Fourth Amendment would privilege equally with the home.  *See Oliver v. United States*, 466 U.S. 170, 180 (1984) ("The curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life.") (cleaned up); *Mack v. City of Abilene*, 461 F.3d 547, 554–55 (5th Cir. 2006) ("several [] courts" have determined "that a parking lot or garage is not curtilage subject to Fourth Amendment protections.").

(1968).  Could the Secret Service officers "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" approaching Lovett in the first place?  *Id.* at 21.  Would those facts "warrant a man of reasonable caution in the belief that the action taken was appropriate?"  *Id.* at 21–22 (cleaned up).

Suppose reasonable suspicion covered the initial stop.  Moving on, the Court would inevitably face assertions that the stop ripened into an arrest without probable cause, an inquiry inherently riddled with line-drawing and judgment calls.  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  When did the purported ripening occur?  When Lovett was pushed up against the wall?  Compl. ¶ 30.  When Lovett was tased and hit the cement?  *Id.* ¶ 32.  Or not until Lovett was formally arrested?  *Id.* ¶ 38.  Onto the arrest itself, whenever that occurred.  At that point, was there probable cause?  And so the analysis would go.

Of course, this differs markedly from what the Court would do if it were facing the facts of *Bivens* itself.  Because an arrest in the home generally requires a warrant, the Court would focus on whether agents obtained such a warrant and, if not, whether one of the various exceptions to the warrant requirement applied.  *See, e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  Sure, it would need to *ultimately* ask whether, at bottom, probable cause supported the arrest.  *Bivens*, 403 U.S. at 389.  But the route to get there would vary considerably.

The excessive force claim plays out similarly.  Lovett alleges admittedly egregious behavior by the federal officers.  They purportedly tased Lovett such that "he was momentarily rendered speechless from the severe pain," although he was standing "with his hands above his head" and "complying with the officers' instructions."  Compl.  ¶¶ 30, 33.  On the other hand, Bivens was fettered in chains and "subjected to a visual strip search."  *Bivens*, 403 U.S. at 389.  But judicial assessment of excessive force claims differs as the degree of force intensifies.  And

these cases are heavily fact-specific, so contextual anomalies make a big difference. *Saucier v. Katz*, 533 U.S. 194, 206 (2001)*; see also Oliva v. Nivar,* 973 F. 3d 438, 443 (5th Cir. 2020) (noting differing legal mandates between *Bivens* and allegedly unlawful arrest involving hospital's ID policy). In short, the applicable precedents and pertinent arguments would diverge in kind and in counsel. *Accord Robinson v. Pilgram*, 2021 WL 5987016, at *12 (D.D.C. Dec. 17, 2021) (finding excessive force claim where "Plaintiff's harm stem[med] from arrest outside the home" was new *Bivens* context), *aff'd*, 2022 WL 3009621 (D.C. Cir. July 28, 2022) (per curiam).

To recap: For Lovett and Bivens alike, there is unique "judicial guidance as to how an officer should respond to the problem or emergency to be confronted." *Ziglar*, 582 U.S. at 140. In a counterfactual world, a *Lovett* court and a *Bivens* court would chart two very different legal paths. This difference signals a new *Bivens* context.

Lovett's altercation also involved a "new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). This being the Secret Service, rather than the DEA agents in *Bivens*, the congressman in *Davis*, or the prison officials in *Carlson*.[2] The Supreme Court has yet to sanction a *Bivens* remedy against the Secret Service. And the D.C. Circuit has affirmed a refusal to "extend *Bivens* to a novel class of defendants—Secret Service agents." *Robinson*, 2022 WL 3009621, at *1 ("Similarly, appellant cannot seek damages from appellees in their individual capacities because he has no implied cause of action in the present context under [*Bivens*]."). More, the Supreme Court and the Circuit have consistently rebuffed attempts to extend *Bivens* to new classes of federal officials. *Mesa*, 589 U.S. at 96 (refusing to extend

---

[2] *Bivens* technically involved agents from the Federal Bureau of Narcotics, but this agency was later subsumed into the modern Drug Enforcement Agency. 5 U.S.C. § App. 1 Reorg. Plan 2 1973.

*Bivens* to "new field" of excessive force claims against Customs and Border Protection Agent); *Boule*, 596 U.S. at 494 (same); *Buchanan*, 71 F.4th at 1006–10 (U.S. Park Police).

While the agency name emblazoned on a federal officer's badge may seem like a trivial matter, federal agencies have different duties, jurisdictions, and authorities that could alter the relevant legal analysis. And the *rank* of the law enforcement personnel can affect the analysis, too. *Ziglar*, 582 U.S. at 139–40. Both distinctions matter here.

For one, the Secret Service Uniformed Division is tasked with safeguarding residences and facilities where Secret Service protectees (think the President, Vice President, and their families) reside and work.[3] *See United States v. Griffin,* 549 F. Supp. 3d 49, 54 (D.D.C. 2021) (describing Secret Service mission and protectees). This "permanent police force" is governed by a unique statutory framework and subject to the authority of the Secretary of Homeland Security. 18 U.S.C. § 3056A. It is a specialized agency with a narrowly limited mission and geographic jurisdiction.

On the other hand, the DEA enforces controlled substances laws and cracks down on drug traffickers nationwide.[4] The DEA operates under a slew of federal regulations and statutes, such as the Controlled Substances Act, and falls under the purview of the Attorney General. *See* 21 U.S.C. § 811 *et seq.*; 28 C.F.R. § 0.100. So "the legal mandate under which the [Secret

---

[3] *See Uniformed Division Officer*, U.S. Secret Serv., https://perma.cc/TJ3B-4RSR. When "determining whether a complaint fails to state a claim, the court may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). And "[c]ourts in this jurisdiction have frequently taken judicial notice of information on official public websites of government agencies." *Pharm. Research & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

[4] *What We Do*, U.S. Drug Enf't Admin., https://perma.cc/YT5P-FT4A.

Service] officials were operating is different from the ones in *Bivens*," indicating a new context. *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020).

Secret Service *officers* also have different duties than DEA *agents*.  *Cf. Oliva*, 973 F.3d at 443 (contrasting duties of VA hospital officers and DEA agents).  Federal law enforcement officers concentrate on patrol and arrest functions; they are on the ground keeping the public safe, responding to calls for service.  Meanwhile, federal agents usually specialize in a criminal field and engage in complex investigations involving sprawling cases.  *Compare* 18 U.S.C.A. § 3056A(b)(2) (noting that the Secret Service Uniformed Division "shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia") *with* 5 U.S.C. § App. 1 Reorg. Plan 2 1973 (recognizing the Attorney General and the agents under him may "make investigations . . . including activities relating to the suppression of illegal traffic in narcotics.").  So the everyday work of these officials is contextually distinct.  *See Ziglar*, 582 U.S. at 140.

In short, Lovett's claims have unique "legal and factual components" that place them in a new *Bivens* context.  *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015).  This Court heeds the prevailing wariness to permit even incremental extensions of *Bivens*.  *Ziglar*, 582 U.S. at 147 ("[E]ven a modest extension is still an extension.").

For his part, Lovett depends on *Hicks v. Ferreyra* to insist that he is right at home in *Bivens*.  64 F.4th 156, 164 (4th Cir. 2023).  There, the Fourth Circuit held that an unlawful seizure claim stemming from traffic stops by the U.S. Park Police was not "meaningfully different from the claim asserted in *Bivens*."  *Id.* at 162.  Specifically, it found that "[b]oth cases involved allegations of unjustified, warrantless seizures in violation of the Fourth Amendment committed by federal 'line' officers conducting routine police work."  *Id.*  Of course, this Court

11

is not bound by that precedent.  Nor does the holding there follow from the Supreme Court's admonition to resist "superficial similarities" when asking whether a case presents a new context. *Boule*, 596 U.S. at 495.  Notwithstanding *Hicks*, Lovett's claims fall comfortably within the Supreme Court's "broad" conception of a "new context." *Mesa*, 589 U.S. at 102.

That brings the Court to the second step in the inquiry:  whether there are special reasons to hesitate before extending a *Bivens* remedy to Lovett. *Ziglar*, 582 U.S. at 136.  Several considerations show that Congress should be calling the shots here.

To start, Lovett has alternative remedial schemes under which he could proceed. *Boule*, 596 U.S. at 498 ("So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy.").  He is already invoking one of these schemes by bringing FTCA claims against the United States.  Compl. ¶ 63, 25–27.  The FTCA, though not displacing *Bivens* actions altogether, is "the exclusive remedy for most claims against Government employees arising out of their official conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010); *Mesa*, 589 U.S. at 111 n.9.  So the availability of FTCA claims, while maybe not dispositive, cuts against extending *Bivens* here. *See K.O. by & through E.O. v. Sessions*, 41 F.4th 664, 665 (D.C. Cir. 2022) (Silberman, J., concurring) ("[P]laintiffs in this case had an alternative remedy for damages under the [FTCA] . . . which makes their appeal for a *Bivens* action seem wholly superfluous."); *Edwards v. Gizzi*, 2022 WL 309393, at *8–10 (S.D.N.Y. Feb. 2, 2022) (noting the FTCA is an alternative remedy to *Bivens* and special factor counselling hesitation and collecting cases), *aff'd*, 107 F.4th 81 (2d Cir. 2024).

More, Lovett can file complaints through internal grievance processes. *Compare Boule*, 596 U.S. at 497 (finding administrative remedies "independently foreclose[d]" a possible *Bivens*

extension).  Secret Service officers are subject to the authority of the Department of Homeland Security, which is authorized to "proscribe regulations for . . . the conduct of its employees."  5 U.S.C. § 301.  And Congress designated an Inspector General to investigate and report misconduct by Homeland Security employees, including Secret Service members.  5 U.S.C. app. 3 §§ 2, 3, 4(d).  Individuals can tee up these investigations by reporting abuses with the Department's Office of Inspector General or the Secret Service's Office of Professional Responsibility Inspection Division.[5]  These probes can even lead to criminal prosecutions. U.S.C. app. 3 § 4(d); 18 U.S.C. § 242.

Clearly, "the Government has put in place safeguards to prevent constitutional violations from recurring," and it is not the role of this Court to trump them.  *Boule*, 596 U.S. at 498 (cleaned up).  Even if these remedies fail to replicate a *Bivens* claim or fully ameliorate the alleged harm, they counsel against judicial meddling.  *See Storms v. Shinseki*, 319 F. Supp. 3d 348, 357-358 (D.D.C. 2018) (noting that even if the specific wrong may go unredressed, a congressionally-mandated scheme counsels against a *Bivens* extension).

Finally, the national security concerns present here also counsel against an extension of *Bivens*.  *Ziglar*, 582 U.S. at 142–43 (noting "[n]ational-security policy is the prerogative of the Congress and the President.").  While the Court recognizes that "national security" should not be invoked as a "talisman used to ward off inconvenient claims," the unique role of the Secret Service in protecting the nation's top-ranking leaders cannot be ignored.  *Id.* at 143.  Permitting a private monetary remedy against these officials may "bog[] down" otherwise swift decisionmaking with "considerations of future liability and damages."  *Robinson*, 2021 WL

---

[5] *See Hotline: Report Corruption, Fraud, Waste, Abuse, Mismanagement, or Misconduct*, Off. Inspector Gen., https://perma.cc/3WRB-FYDE; *Report Employee Misconduct*, U.S. Secret Serv., https://perma.cc/Z23W-XTBB.

5987016, at *14.  But "[g]iven the nation's overwhelming interest in protecting the safety of its Chief Executive, officers responsible for the protection of the President and other high-ranking officials must be able to act without hesitation."  *Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 13 (D.D.C. 2023) (cleaned up).  In short, the Secret Service's distinctive role in promoting national security, and the judiciary's relative illiteracy in that subject, signal that Congress is best equipped to discern a proper framework for deterrence.  The Court declines to throw a punch when it is ill-suited for the match.

Thus, Lovett has failed to plead a viable cause of action against the Secret Service agents.

## B.

Now for the § 1983 claims against the District Defendants.  Lovett brings four claims against the District of Columbia and a cluster of unidentified MPD officers:  unreasonable seizure; excessive force; failure to intervene; and conspiracy to commit constitutional violations. He has adequately pled claims against the officers.  But the District is not liable for their actions.

## 1.

Consider first the claims as raised against the individual officers.  The first two counts assert that they violated Lovett's Fourth Amendment rights to be free from unreasonable seizures and excessive force "when they yelled, confined, shoved, intimidated, jostled, and tased [him] repeatedly for a 'traffic stop,' and continued to do so even when he was incapacitated."  Compl. ¶ 78.

The District Defendants do not dispute that these facts, taken as true, establish a constitutional infringement.  Instead, their sole defense boils down to a claim of "we weren't there."  The District Defendants insist that Lovett's Complaint "makes clear that this conduct

was allegedly perpetrated by Secret Service officers, *not* any MPD officer." Mot. Dismiss by D.C., ECF No. 25, at 5. According to the District Defendants, "[b]ecause there is no allegation that any MPD officers had physical contact with Plaintiff, Counts I and II cannot establish an underlying constitutional violation." *Id.*

But the Court reads the Complaint differently. True, Lovett alleges that the very early stages of the encounter involved only three Secret Service officers. Compl. ¶¶ 17–25. But very quickly, Lovett asserts that multiple officers surrounded him, some of whom may have been MPD. *Id.* ¶¶ 27–29 (noting that "another officer" joined the Secret Service officers while Lovett queried why he was being detained). It is only *after* unidentified officers joined the pack that Lovett was tased repeatedly, tackled, and arrested. *Id.* ¶¶ 31–38. And Lovett alleges that "officers from both the United States Secret Service and the Metropolitan Police Department were present at various points throughout the interaction." *Id.* ¶ 16. So construing the facts in the light most favorable to Lovett, the Court finds it plausible that an MPD officer was one of the aggressors. *Sparrow*, 216 F.3d at 1113.

The District Defendants contend that a Secret Service Arrest Report proves that no MPD officer was present on the scene at all. D.C.'s Mot. Dismiss 6. But the Court does not read the Arrest Report so broadly. [6] That document does not establish that MPD officers were *not* present on the scene. It merely omits any mention of MPD. D.C.'s Mot. Dismiss Ex. A. Without more

---

[6] The Secret Service Arrest Report is incorporated into the Complaint. *See* Compl. ¶ 169 ("Based on the recently provided United States Secret Service Arrest Report, it appears that the officer who tased Plaintiff was Defendant Lineberger."). So the Court will take judicial notice of its contents. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering public records appended to Defendants' motion to dismiss because they were referred to in the complaint); *Martin v. District of Columbia*, 720 F. Supp. 2d 19, 25 (D.D.C. 2010) (treating police report as incorporated into the complaint when it was referenced therein).

context, it is plausible that the Arrest Report excludes MPD officers because it focused solely on the Secret Service—not because MPD was absent.  The Arrest Report, then, is not the masterstroke the District Defendants think it is.

In sum, the Court finds it plausible that MPD officers were present during the incident. Because the District Defendants do not contest that the Complaint makes out a constitutional violation, these claims can go forward.

Consider now Count Three, the Failure to Intervene claim.  Courts in this district have held an officer liable for a failure to intervene "if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 67 (D.D.C. 2018). Again, the District Defendants hang their hats on Lovett's failure to "allege any MPD officer was on the scene before or during the alleged Secret Service assault or that they had an opportunity to respond, or chose not to act."  D.C.'s Mot. Dismiss 6.  But having rejected that defense for now, the Court infers that the officers could have stopped the incident by intervening.  Or, worse, that the officers "approved of the other officers' alleged use of force." *Jackson*, 327 F. Supp. 3d at 67.  So taking Lovett at his word, he has plausibly pled a failure-to-intervene claim.

Finally, Lovett's claim of conspiracy.  He asserts that "Defendants conspired amongst themselves to deprive [him] of his constitutional rights."  Compl. ¶ 102.  He insists that the District Defendants "conspired with each other" and with the Secret Service agents to "pursu[e] an unlawful traffic stop"; "detain Plaintiff without reason while trying to find a way to charge Plaintiff"; "refus[e] . . . to fully investigate Plaintiff's responses to each attempted accusation"; "exhibit[] excessive force"; "omit[] material facts relating to the stop and arrest in the police report"; and "jail[] Plaintiff without cause."  *Id.* ¶ 106.  He "believes that the Defendants formed

their conspiracy at the scene of the incident, upon the realization that the Defendants had no legitimate reason or probabl[e] cause to stop or detain" him. *Id.* ¶ 103.

To make out a case for civil conspiracy under § 1983, Lovett must plausibly allege that "the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Austin v. District of Columbia*, 2007 WL 1404444, at *11 (D.D.C. May 11, 2007) (cleaned up). The linchpin of an adequate conspiracy claim is the allegation of an agreement. *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014). And the allegation must "reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try and accomplish a common and unlawful plan." *Austin*, 2007 WL 1404444, at *11 (cleaned up).

But Lovett does not offer any specific contentions about "when or how such an agreement was brokered," nor does he "allege the existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds between any of the defendants." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010); *McCreary v. Heath*, 2005 WL 3276257, at *5 (D.D.C. Sept. 26, 2005) (cleaned up). Instead, he presents unbuttressed hypotheses about scheming and concealing. This is not enough; "[t]he mere repetition of a conclusory statement that a conspiracy exists and that all the alleged events occurred as a result of a conspiracy are insufficient as a matter of law." *Bush v. Butler*, 521 F. Supp. 2d 63, 69 (D.D.C. 2007). The conspiracy claims must be dismissed.

**2.**

Now consider the District of Columbia's municipal liability. To recap: Except for the conspiracy claims, all the claims against the MPD officers survive. So Lovett has established the first element of municipal liability—an underlying constitutional violation at the hands of local

officials.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  But a locality is

not liable for every constitutional violation committed by its employees.  That is, neither

respondeat superior nor vicarious liability is a viable theory against localities under § 1983.  *City*

*of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694–95.  Instead, the

municipality *itself* must be at fault.  *Harris*, 489 U.S. at 385.  And fault attaches only when a

policy or custom of the city directly causes the predicate constitutional deprivation.  *Id.*

     This can play out in a few different ways.  For instance, the government could set a

formal unconstitutional policy.  *Baker*, 326 F.3d at 1306; *Monell*, 436 U.S. at 694–95.  Or a

policymaker could consciously violate a person's rights.  *City of St. Louis v. Praprotnik*, 485

U.S. 112, 123–30 (1998).  Maybe some subordinates are engaging in a pattern of wrongdoing,

and their boss's acquiescence led to the adoption of a custom.  *Id.* at 130.  Perhaps still the

government has failed to address an obvious demand—say, the training of its employees—such

that it has shown deliberate indifference to likely constitutional deprivations.  *Harris*, 489 U.S. at

390; *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).  Regardless of the

precise factual setup, one core element must exist:  a policy or custom of the municipality that

was a "moving force" behind the constitutional harm.  *Harris*, 489 U.S. at 389.

     Lovett proceeds against the District under a couple of theories.  He first claims that

deficient training by the District amounts to deliberate indifference.  He posits that "the District

of Columbia failed to properly train its police officers" on various tactics, including "the

reasonableness of seizures," "de-escalation polic[ies]," and "intervention."  Compl. ¶¶ 69, 82, 93.

     But Lovett's assertions are unsubstantiated.  He does not enlighten the Court on the

education that officers receive or the academic program that the District executes.  Instead, he

tenders mere suspicions that the coursework is lacking.  Without allegations of corroborating

evidence, the Court cannot deduce the curriculum's inadequacy; one-off constitutional violations by individual officers do not suffice. *Harris*, 489 U.S. at 390–91. To be sure, a gross pattern of official wrongdoing can serve as evidence of deficient instruction. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But Lovett has not alleged that MPD consistently flouts Fourth Amendment rights. Or that the District "knew or should have known" about it. *Baker*, 326 F.3d at 1307; *cf. Daskalea*, 227 F.3d at 441 (finding municipality was "deliberately indifferent to the repeated sexual abuse and harassment of women prisoners by D.C. correctional officers" where it had received complaints and been subject to a prior court order demanding the District "take all steps necessary to prevent sexual harassment of female prisoners, including the institution of mandatory training" but failed to do so).

With a bit more specificity, Lovett asserts that the District was "deliberately indifferent" to the harm posed in classifying both pepper spray and tasers as "Less Lethal Weapons." Compl. ¶ 81. According to Lovett, "[b]y categorizing an irritant such as pepper spray with weapons like tasers, the policy maker is condoning use of one in place of the other, even though tasers are far more violent." *Id.* As an alleged consequence, "the force used against [Lovett] quickly escalated, violating his Fourth Amendment right to be free from excessive force." *Id.*

But this argument falters. The purported "inadequacy" of the guideline was not "so likely to result in the violation of constitutional rights that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" to revise it. *Harris*, 489 U.S. at 390. Again, Lovett offers no claim leading to the inference that the guideline caused a pattern of constitutional violations. This is likely because the notion that the guideline could lead to escalations of force is tenuous at best. And the mere grouping of tasers with pepper spray does not privilege the use of the former above the latter, contrary to Lovett's assertions. Plus, the

Less Lethal Weapons guidelines is not the final word on the matter:  The District provides more information to officers about when each weapon is proper to use.[7]  So a reasonable policymaker would not see the guidelines as begetting unreasonable uses of force.  *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).

Next, Lovett brings claims under a custom-by-acquiescence theory.  He insists that the District "failed to properly investigate and/or discipline officers for unreasonable seizures" and "properly screen officers' use of weapons such as tasers."  Compl. ¶ 70.  These oversights, according to him, "manifested a . . . custom . . . of allowing officers to violate the constitutional rights of citizens without fear of repercussions" and "encourage[ed] officers to engage in unlawful conduct."  *Id.* ¶¶ 70, 83.  But again: what custom?  The Court searches in vain for allegations of a pattern of violations.  Lovett himself may have suffered constitutional insult at the hands of D.C. officers.  But, without more, a single incident is only anecdotal.  The Court cannot ignore elementary rules of statistics based on one plaintiff's experience.  *See* Ivo Dinov et al., *Law of Large Numbers*, 17 J. Stat. Educ. 1 (2009) (describing a sample of one as inherently variant and unreliable).  So without anything beyond conclusory assertions, the claims against the District must be dismissed.

## C.

Finally, Lovett's state-law claim.  He brings an action for Negligent Infliction of Emotional Distress (NIED) against all the District Defendants.  Compl. 27.  This Court applies D.C. law when adjudicating state-law claims under diversity jurisdiction.  *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

---

[7] *See General Order: Less Lethal Weapons*, MPD (Mar. 28, 2024), https://perma.cc/7NPF-G24Y.

To state a claim of NIED in the District of Columbia, a plaintiff must show that "(1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 915 (D.C. Cir. 2015).[8] "Serious and verifiable means that the distress must have manifested in an external condition or physical symptoms." *Rice v. District of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011).

Lovett does not state a plausible NIED claim.  For one, he does not allege any specific negligent conduct by the MPD officers.  Instead, he posits the officers "recklessly used excessive force to unreasonably restrain, assault, batter, tase, and seize Plaintiff."  Compl. ¶ 177.  But general assertions of reckless and intentional conduct cannot make out a claim for *negligent* behavior.  So for that reason alone, his NIED claim against the officers must fail.  *See Rice*, 774 F. Supp. 2d at 33–34 (dismissing NIED claim because it failed to "distinguish between negligent and intentional acts" or "identify any specific act that was allegedly negligent").

Plus, Lovett fails to back up his naked claims of physical and emotional harm.  Instead, he baldly asserts "psychological trauma," "emotional distress," and "physical and mental injury" as bases for relief.  Compl. ¶¶ 178–80.  But "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).  Perhaps Lovett has suffered severe distress.  But the Court cannot go hunting between the lines of the Complaint in search of clues.

---

[8] A slightly different standard applies for NIED claims brought against defendants with a special relationship to the plaintiff.  *See Kowalevicz v. United States*, 302 F. Supp. 3d 68, 78 (D.D.C. 2018).  But Lovett has alleged no special relationship here, nor would the caselaw support such a claim.  *Id.* (explaining that officers have no special relationship with an arrestee).

Because Lovett has failed to establish a predicate violation here, he cannot state a claim for municipal liability, either. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). His NIED claim against all District Defendants is accordingly dismissed.

## IV.

After Defendants moved to dismiss, Lovett sought leave to file a Second Amended Complaint. In the proposed amended complaint, Lovett makes three small changes to the facts section. Pl.'s Mot. Leave File Second Amend. Compl. Ex. B at 6–8. The net effect is to slightly alter the alleged timeline. In the First Amended Complaint, the officers informed Lovett they believed his vehicle was stolen at the very beginning of the encounter. *Id.* But now Lovett alleges he was unaware of that suspicion until being placed in the ambulance. *Id.* at 6–8.

Typically, a plaintiff may amend his complaint with leave of court "when justice so requires." Fed. R. Civ. P. 15(a)(2). But a court may deny leave to amend where a motion was unduly delayed or is futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, granting leave to amend would be futile because it would not resurrect any of Lovett's failed claims. Tweaking the chronology does not affect Lovett's lack of a *Bivens* claim against the federal officers. Nor does it address the deficiencies in his claims of municipal liability. Finally, it does not make it more plausible that the MPD officers engaged in a conspiracy or negligently inflicted emotional distress upon Lovett, as it does not go to ameliorating those claims' shortcomings. Because the updated complaint would not save Lovett's implausible claims, the motion to amend is denied as futile. *See Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020).

## V.

In sum, the claims against the Secret Service officers fail for want of a cause of action. Most of the claims against the MPD officers survive, except for the conspiracy and NIED claims.

All the claims against the District of Columbia are dismissed.  And the United States did not move to dismiss the claims against it, so those claims proceed.

The Court **ORDERS** that the Motion to Dismiss by the Federal Officers is **GRANTED**. The Motion to Dismiss by the District of Columbia is **GRANTED IN PART** and **DENIED IN PART**.   The Motion for Leave to File a Second Amended Complaint is **DENIED.**

**SO ORDERED**.


Dated: September 25, 2024

_____
TREVOR N. McFADDEN, U.S.D.J.